**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| JACOB MURRAY and CHRISTA MURRAY, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>SOUTHWOOD FINANCIAL, LLC,<br><br>*Defendant*. | INDEX NO.: 3:25-cv-573<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

**PLAINTIFFS' CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Jacob Murray and Christa Murray ("Plaintiffs"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant, Southwood Financial, LLC, ("Southwood" or "Defendant"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## I. INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain personally identifiable information ("PII") (collectively, the "Private Information") of its current and former employees and borrowers, the putative class members ("Class"). This Data Breach occurred on or around March 25, 2025.

2. Defendant Southwood is a Virginia based limited liability company that operates as a student loan administrator, managing distressed student loan receivables with industry leaders.[1]

3. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

4. Plaintiffs are current and former employees and borrowers who entrusted Southwood their Private Information as part of their exchange to receive financial services.

5. Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address injuries and expenses resulting from Defendant's conduct preceding and proceeding the Data Breach, including, but not limited to, inadequate safeguarding of the Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their Private Information was subjected to unauthorized access by an unknown third party and precisely what specific type of Private Information was accessed.

6. As a direct result of the Defendant's conduct, the Private Information was improperly disclosed to the cyber-criminals who perpetrated the attack and criminals who now have access to the Private Information through the dark web.

7. The Private Information compromised in the Data Breach included certain PII including but is not limited to "name, Social Security number, date of birth, address, telephone number, email address, and other account information" *See* Notice of Data Breach, attached hereto as Exhibit A.

---

[1] https://swfin.com/about-us/ (last visited July 23, 2025).

8. Plaintiffs' and Class Members' identities and financial health are now at risk because of Defendant's conduct.

9. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

10. Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, and adequate credit monitoring services funded by Defendant.

11. Accordingly, Plaintiffs sue Defendant seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence per se, (iii) breach of implied contract, and (iv) unjust enrichment.

## II. PARTIES

12. Plaintiffs Jacob Murray is and at all times mentioned herein was an individual citizen of Virginia, residing in the city of Harrisburg.

13. Plaintiffs Christa Murray is and at all times mentioned herein was an individual citizen of Virginia, residing in the city of Harrisburg.

14. Defendant Southwood, is a Virginia-based public corporation with its headquarters and principal place of business at 45610 Woodland Rd Ste 440, Sterling, VA 20166.[2]

15. Defendant can be served through its registered agent, CT Corporation System, at 4701 Cox Rd Ste 285, Glenn Allen, VA 23060.[3]

---

[2]https://cis.scc.virginia.gov/EntitySearch/BusinessInformation?businessId=11539259&source=FromEntityResult&isSeries%20=%20false (last visited July 23, 2025)

[3] *Id.*

## III. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members exceeds 100, some of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. 1332(d)(2)(A).

17. This Court has personal jurisdiction over Defendant because it is a company that operates and has its principal place of business in this District and conducts substantial business in this District.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Defendant is domiciled in this District, maintains Plaintiffs' and Class Members' Private Information in this District, and has caused harm to Plaintiffs and Class Members in this District.

## IV. FACTUAL ALLEGATIONS

***Defendant's Business***

19. Defendant Southwood is a Virginia based limited liability company that operates as a student loan administrator, managing distressed student loan receivables with industry leaders.[4]

20. Defendant Southwood assists borrowers by providing payment plans to help borrowers resolve accounts through a trustworthy, frictionless experience.[5]

21. Plaintiffs and Class Members are current and former employees and borrowers who provided their Private Information to Defendant in exchange for financial services.

22. In the ordinary course of business, Defendant's employees and borrowers are

---

[4] https://swfin.com/about-us/ (last visited July 23, 2025).

[5] *Id.*

encouraged and/or are mandated to provide the Defendant's (and Plaintiffs did provide) Defendant with sensitive, personal, and private information, such as his or her: full name, date of birth, medical information and health insurance information.[6]

23. Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with their obligations to keep such information confidential and secure from unauthorized access.

24. Defendant stored this Private Information in its information technology computer systems and servers, on information and belief located at its principal place of business in North Chesterfield, Virginia.

***Defendant Acquires, Collects & Stores Employees and borrowers.' Private Information***

25. Defendant acquires, collects, and stores a massive amount of Private Information on its current and former employees and borrowers.

26. As a condition of becoming a patient of Defendant, Defendant requires all employees and borrowers to entrust it with highly sensitive personal information.

27. By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

28. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendant absent a promise to safeguard that information.

[6] *See* Notice of Security Breach (Exhibit A).

29. Upon information and belief, while collecting Private Information from employees and borrowers, including Plaintiff, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

30. Plaintiffs and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

31. All of Defendant's employees, staff, entities, sites, and locations may share employees and borrowers' Private Information with each other for various purposes, as should be disclosed in a compliant privacy notice ("Privacy Policy") that Defendant is required to maintain.

32. Upon information and belief, Defendant's Privacy Policy is provided to each patient prior to receiving financial services.

33. Defendant agreed to and undertook legal duties to maintain the protected health and personally identifiable information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws.

34. The employees and borrowers' information held by Defendant in its computer system and network included the Private Information of Plaintiffs and Class Members.

***THE DATA BREACH***

35. A Data Breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by an entity like Defendant.

36. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks.

37. On or about June 27, 2025, Defendant mailed Plaintiffs a "Notice of Data Security Incident"[7] that stated in part:

> What Happened:
>
> On March 25, 2025, we discovered suspicious activity that temporarily disrupted the operability of our computer network. Upon learning of this activity, we took immediate steps to secure our environment and engaged digital forensics specialists to assist with the investigation. Through the investigation, we discovered that certain files may have been accessed or acquired without authorization. We reviewed those files and determined on May 29, 2025 that some of your personal information was within the potentially affected data which is the reason for this notification.
>
> What Information was Involved:
>
> The information may have included your name, Social Security number, date of birth, address, telephone number, email address and other account information.

38. Plaintiffs' notice letters were dated June 27, 2025—nearly three months after Defendant discovered the Data Breach but an unknown time after the Data Breach occurred.

39. Within this notice, Defendant failed to state whether it was able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that Southwood continues to maintain is secure. Defendant also failed to state how the breach itself occurred. All this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity and wide array of information compromised in this specific breach.

40. Defendant's data security obligations were particularly important given the substantial increase in Data Breaches in the financial services industry preceding the date of the breach.

41. In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892

[7] Exhibit A

individuals' information being compromised, a 78% increase from 2022.[8]

42. Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

43. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***DATA BREACHES ARE PREVENTABLE***

44. Defendant failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

45. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

46. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[9]

47. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of

[8] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited July 23, 2025)
9 How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited July 23, 2025)

ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a

virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[10]

48. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[11]

---

[10] *Id.* at 3-4.

[11] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed July 23, 2025).

49. Given that Defendant was storing the Private Information of its current and former employees and borrowers Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

50. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiffs and Class Members.

***VALUE OF PRIVATE INFORMATION***

51. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[12]The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

52. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[14] For example, Personal Information can be sold at a price ranging from $40 to $200.[15]

[12] 17 C.F.R. § 248.201 (2013).
[13] *Id.*
[14] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last viewed July 23, 2025)
[15] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last viewed July 23, 2025)

Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

53. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

54. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***DEFENDANT FAILS TO COMPLY WITH FTC GUIDELINES***

55. The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

56. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security

---

[16] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last viewed July 23, 2025)
[17] *Report to Congressional Requesters, GAO, at 29 (June 2007), available at:* *https://www.gao.gov/assets/gao-07-737.pdf* *(last visited* July 23, 2025)

problems.[18]

57. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

58. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

59. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

60. Defendant failed to properly implement basic data security practices.

61. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees and borrowers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

62. Defendant was always fully aware of its obligation to protect the PII of its

---

[18] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited July 23, 2025).

[19] *Id*.

employees and borrowers. Defendant was also aware of the significant repercussions that would result from its failure to do so.

63. As shown above, experts studying cyber security routinely identify financial service providers as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

64. Several best practices have been identified that a minimum should be implemented by financial service providers like Defendant, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

65. Other best cybersecurity practices that are standard in the financial services industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

66. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including, without limitation, PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

67. These foregoing frameworks are existing and applicable industry standards in the financial services industry, and Defendant failed to comply with these accepted standards, thereby

opening the door to and causing the Data Breach.

## V. DEFENDANT'S BREACH

68. Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect employees and borrowers' Private Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D); and

69. As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

70. Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

***Plaintiffs and the Class Members Have and Will Experience Substantial Harm***

71. Plaintiffs and members of the proposed Class have suffered injury from the misuse

of their PII that can be directly traced to Defendant.

72. The ramifications of Defendant's failure to keep Plaintiffs' and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

73. Because of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

- The loss of the opportunity to control how their PII is used;
- The diminution in value of their PII;
- The compromise and continuing publication of their PII;
- Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;
- Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;
- Delay in receipt of tax refund monies; Unauthorized use of stolen PII; and
- The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in its possession.

74. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to

$1,000.00 depending on the type of information obtained.

75. The value of Plaintiffs' and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

76. It can take victims years to spot identity or PII theft, giving criminals plenty of time to abuse that information for money.

77. One such example of criminals using PII for profit is the development of "Fullz" packages.

78. Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

79. The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

80. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

81. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" Defendant did not rapidly report to Plaintiffs and the Class that their PII had been stolen.

82. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

83. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

84. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

85. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially

valuable. Data is currency."[20]

86. The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

- encrypting information stored on computer networks;
- retaining payment card information only as long as necessary;
- properly disposing of personal information that is no longer needed;
- limiting administrative access to business systems;
- using industry-tested and accepted methods for securing data;
- monitoring activity on networks to uncover unapproved activity;
- verifying that privacy and security features function properly;
- testing for common vulnerabilities; and
- updating and patching third-party software.

87. According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[21]

88. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

89. Defendant's failure to properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability

[20] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009).(last visited July 23, 2025)

[21] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-libSouthwoody/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited July 23, 2025 ).

to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

90. Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

***DATA BREACHES PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTITY THEFT***

91. Data Breaches such as the one experienced by Defendant's employees and borrowers are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

92. The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

93. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

94. Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

95. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name

[22] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited July 23, 2025) ("GAO Report").

[23] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited July 23, 2025).

and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

96. Theft of Private Information is gravely serious. PII is a valuable property right.[24] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

97. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.
>
> *See* GAO Report, at p. 29.

98. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

---

[24] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

99. There is a strong probability that all the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

100. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[25]

101. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

102. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[26]

103. Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[27]

104. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

105. It is also hard to change or cancel a stolen Social Security number.

---

[25] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited July 23, 2025).
[26] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 23, 2025).
[27] *Id* at 4.

106. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[28]

107. In recent years, the financial services industry has experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## VI. PLAINTIFFS' EXPERIENCE

108. Plaintiffs Jacob and Christa Murray are and at all times mentioned herein were individual citizens of Virginia, residing in the city of Harrisburg.

109. Plaintiffs provided Defendant with their sensitive PII to receive financial services.

110. Plaintiffs received notice of the Data Breach around June 27, 2025, informing them that their sensitive information was part of Defendant's Data Breach (Exhibit A).

111. Plaintiffs are careful about sharing their sensitive Private Information. Plaintiffs have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

112. Plaintiffs store any documents containing their sensitive Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiffs diligently chooses unique

[28] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited July 23, 2025).

usernames and passwords for their sensitive online accounts.

113. Had Plaintiffs been aware that Defendant's computer systems were not secure, they would not have entrusted their personal data to Defendant.

114. Because of the Data Breach, Defendant advised Plaintiffs to take certain steps to protect their Private Information and otherwise mitigate their damages.

115. Because of the Data Breach, Plaintiffs spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring their accounts to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. This time was spent at Defendant's direction by way of the Data Breach notice where Defendant recommended that Plaintiffs mitigate their damages by, among other things, monitoring their accounts for fraudulent activity.

116. Even with the best response, the harm caused to Plaintiffs cannot be undone.

117. Plaintiffs suffered actual injury in the form of damages to and diminution in the value of Plaintiffs' Private Information—a form of intangible property that Plaintiffs entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiffs suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and have anxiety and increased concerns for the loss of their privacy.

118. Plaintiffs have suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

119. Plaintiffs have a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches

## VII. PLAINTIFFS AND CLASS MEMBERS DAMAGES

120. To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered inadequate identity monitoring services, despite Plaintiffs and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

121. The credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. What's more, Defendant places the burden on Plaintiffs and Class Members by requiring them to expend time signing up for that service rather than automatically enrolling all victims of this Data Breach.

122. Defendant's credit monitoring advice to Plaintiffs and Class Members places the burden on Plaintiffs and Class Members, rather than on Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach.

123. Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

124. Plaintiffs' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

125. Plaintiffs and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

126. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class

Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

127. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

128. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

129. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

130. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

131. Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

132. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

133. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Canceling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Addressing their inability to withdraw funds linked to compromised accounts;

e. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

f. Placing "freezes" and "alerts" with credit reporting agencies;

g. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

h. Contacting financial institutions and closing or modifying financial accounts;

i. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

j. Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

134. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

135. Further, because of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

136. As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VIII. CLASS REPRESENTATION ALLEGATIONS

137. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. Rule 23.

138. Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

139. Plaintiffs propose the following Class definition, subject to amendment as appropriate:

**All persons whose Private Information was compromised because of the Data Breach discovered on March 25, 2025 (the "Class").**

140. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

141. Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

142. This action satisfies the numerosity, commonality, typicality, and adequacy of requirements under Fed. R. Civ. P. 23.

143. Numerosity. In accordance with Rule 23(a)(1), the Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiffs now, but upon information and belief, thousands of individuals had their PII

compromised in this data breach.

144. Commonality. In satisfaction of Rule 23(a)(2), there are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

e. Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h. Whether Plaintiffs and Class Members suffered legally cognizable damages from Defendant's misconduct;

i. Whether Defendant's conduct was negligent;

j. Whether Defendant's conduct was *per se* negligent;

k. Whether Defendant's acts, inactions, and practices complained of herein amount to breach on implied contractual obligations;

l. Whether Defendant was unjustly enriched;

m. Whether Defendant failed to provide notice of the Data Breach promptly; and

n. Whether Plaintiffs and Class Members are entitled to damages, civil

penalties, punitive damages, and/or injunctive relief.

145. Typicality. Pursuant to Rule 23(a)(3) Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiffs is advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defenses are unique to Plaintiff. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

146. Adequacy of Representation. As Rule 23(a)(4) requires Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

147. Predominance. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

148. Superiority. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

149. This class action is maintainable under Fed. R. Civ. P. 23 because the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying

adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

150. This class action is maintainable under Fed. R. Civ. P. 23 because Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

151. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## IX. CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
### (On Behalf of Plaintiffs and All Class Members)

152. Plaintiffs re-allege and incorporates the above allegations as if fully set forth herein.

153. Defendant required Plaintiffs and Class Members to submit non-public personal information as a condition of receiving financial services.

154. By collecting and storing this data in Defendant's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

155. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

156. Defendant's duty of care to use reasonable security measures arose because of the special relationship that existed between Defendant and its employees and borrowers, which is recognized by laws and regulations, as well as common law. Defendant could ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

157. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

158. Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

159. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect timely that Class Members' Private Information had been compromised;

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g. Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

160. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial services industry.

161. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

162. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

163. Defendant's negligent conduct is ongoing, in that they still hold the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

164. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiffs and All Class Members)**

165. Plaintiffs re-allege and incorporates the above allegations as if fully set forth herein.

166. Under the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

167. Defendant breached its duties to Plaintiffs and Class Members under Virginia law by failing to develop and implement policies and procedures necessary to protect Plaintiffs' and Class Members' PII.

168. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

169. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

170. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that by failing to meet its duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

171. As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**THIRD COUNT**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and All Class Members)**

172. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

173. When Plaintiffs and Class Members provided their Private Information to Defendant in exchange for receiving financial services, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

174. Defendant solicited, offered, and invited Class Members to provide their Private

Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

175. In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant federal and state laws and regulations, and adhered to industry standards.

176. Plaintiffs and Class Members paid money to Defendant or provided labor to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

177. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

178. Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures.

179. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

180. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

181. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

182. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

183. Plaintiffs and Class Members are also entitled to injunctive relief requiring

Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FOURTH COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and All Class Members)**

184. Plaintiffs re-allege and incorporates the above allegations as if fully set forth herein.

185. Plaintiffs bring this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of implied contract count above.

186. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

187. As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the portion of each payment made that is allocated to data security is known to Defendant.

188. Plaintiffs and Class Members conferred a monetary benefit on Defendant. Defendant’s acceptance and storage of Plaintiffs' and the other Class members’ Private Information created a fiduciary relationship between Defendant on the one hand, and Plaintiffs and the other Class members, on the other hand. In light of this relationship, Defendant must act primarily for the benefit of its employees, clients, borrowers, and/or customers, which includes safeguarding and protecting Plaintiffs' and the other Class members’ Private Information.

189. Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

190. Defendant enriched itself by saving the costs Defendant reasonably should have

expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

191. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

192. Defendant failed to secure Plaintiffs' and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiffs and Class Members provided.

193. Defendant acquired the Private Information through inequitable means in that they failed to disclose the inadequate security practices alleged.

194. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

195. Plaintiffs and Class Members have no adequate remedy at law.

196. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to:

a. actual identity theft;

b. the loss of the opportunity of how their Private Information is used;

c. the compromise, publication, and/or theft of their Private Information;

d. out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information;

e. lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

f. the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and

g. future costs in terms of time, effort, and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiffs and Class Members.

197. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

198. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## X. PRAYER FOR RELIEF

199. WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above seek the following relief:

a. For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiffs and their counsel to represent the Class, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or

disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c. For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e. Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g. For an award of punitive damages, as allowable by law;

h. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i. Pre- and post-judgment interest on any amounts awarded; and

j. Any other relief that this court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: July 24, 2025

*/s/ Seth R. Carroll*
Seth R. Carroll
VSB 74745
scarroll@hurtinva.com
Commonwealth Law Group
3311 West Broad St.
Richmond, VA 23230
Phone: 804-999-9999

Leigh S. Montgomery*
Texas Bar No. 24052214
lmontgomery@eksm.com
**EKSM, LLP**
4200 Montrose Blvd. Ste 200
Houston, Texas 77006
Phone: (888) 350-3931

**ATTORNEYS FOR PLAINTIFFS AND THE PUTATIVE CLASS**

(* denotes *pro hac vice* forthcoming)